**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **JACK LONG, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:09-cv-00900** |
| | ) | **Judge Trauger** |
| **CITY OF COOPERTOWN, *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Pending before the court are Motions for Summary Judgment filed by defendants City of

Coopertown (Docket No. 77), Sam Childs (Docket No. 78), Adam Bennett (Docket No. 79),

William Zimmerlee[1] (Docket No. 80), and Leslie Foreright (Docket No. 81), to which the

plaintiff has filed a consolidated response (Docket No. 93), and in support of which the

defendants have filed a consolidated reply (Docket No. 101).  Also pending is the defendants'

Motion to Strike (Docket No. 102).  For the reasons discussed below, the defendants' Motions

for Summary Judgment will be granted, and their Motion to Strike will be denied as moot.

## FACTS[2]

---

[1] Zimmerlee is misnamed as "William Zimmerman" in the caption of the case.

[2] Unless otherwise noted, the facts are drawn from the defendants' statement of
undisputed facts (*e.g.*, Docket No. 79, Ex. 6), the plaintiff's response thereto (Docket No. 94),
and related exhibits.  The court draws all reasonable inferences in favor of the non-moving party.
*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Brown v. United
States*, 583 F.3d 916, 919 (6th Cir. 2009).

Coopertown (the "Town") is a small town located in Robertson County, Tennessee.[3] The Town is governed by a mayor and a Board of Aldermen (the "Board"), which writes ordinances and otherwise represents the interests of constituents from the Town's several wards. The plaintiff, Jack Long, Jr., became involved in Coopertown politics shortly after the Town's incorporation in 1996; he served as an alderman from 1998 to 2004 and also as vice mayor from 2002 to 2004. This lawsuit stems from Long's purported appointment to the Board in late 2008.

In October 2008, Alderman Larry Muhlstadt, who was going through a divorce, decided that he would resign his seat at the Board's regularly scheduled October 28, 2008 meeting. Sometime in the middle of that month, Muhlstadt called Long and asked if Long would serve as his replacement. Long replied that he would think about it. The next day, Long called Coopertown Mayor Danny Crosby, who said that Long would have no problem getting nominated and approved by the Board. Crosby already knew of Muhlstadt's plan to resign, and he had contacted Gary Jaeckel, a consultant with Municipal Technical Advisory Service ("MTAS"),[4] and John Holt, the city attorney, to ensure that appointing a replacement at the October 28 meeting would be procedurally proper. Shortly thereafter, Long himself called Jaeckel and Holt to confirm the procedure. The next week, Long called Muhlstadt and said that he would accept the nomination.

---

[3] According to Coopertown's website, the Town had approximately 4,300 residents as of the 2010 census. http://www.coopertowntn.org/The_Mayor's_Corner/ (accessed on July 5, 2011). In addition, although the town is named as "City of Coopertown" in this suit, it appears that its proper name is "Town of Coopertown." *Id.* (*See also, e.g.*, Docket No. 78, Ex. 17.)

[4] The MTAS, which is an agency of the University of Tennessee, assists Tennessee cities and municipalities with questions regarding city operations and trains local officials regarding job duties and responsibilities.

The publicly available agenda for the October 28 meeting listed a number of items but did not mention Muhlstadt's planned resignation.[5] Three of the Town's four aldermen – Muhlstadt, Robert Dale Anderson, and Donnie Gill – were present at the meeting, while the fourth – Margaret Ruth – was absent. Mayor Crosby and various members of the public were also in attendance. At the end of the meeting, Muhlstadt announced his resignation, and, at Muhlstadt's recommendation, Gill moved to nominate Long as Muhlstadt's replacement. Crosby, Anderson, and Gill unanimously voted in favor of appointing Long. The official records of the meeting, however, did not reflect Muhlstadt's resignation or the subsequent vote. (*See* Docket No. 78, Ex. 18 at 2-13.)

On November 4, 2008, Crosby lost the Coopertown mayoral election to defendant Sam Childs.[6] On the same date, Linda Lee was elected as alderman, replacing Gill.[7] Childs claims that, in the weeks after the election, he was focused on a number of issues, including ensuring

---

[5] The items on the agenda included, in relevant part: (1) "Call to Order"; (2) "Pledge of Allegiance"; (3) "Roll Call"; (4) "Bank Balances"; (5) "Public Forum: Limited to three minutes per speaker"; (6) "Reports from the Committees, Communications from the Aldermen"; (7) "Old Business: New Budget 08-09"; (8) "New Business: 'Red Flags' to Personnel Policy"; (9) "Communications from the Mayor," specifically, "Discuss Burgess Gower Rd. primer coat"; and (10) "Adjournment." (Docket No. 78, Ex. 17.)

[6] It appears that Crosby and Childs have long been political rivals, which no doubt contributes to the rancorous nature of Coopertown politics. After Crosby defeated Childs in the 2004 mayoral election, Childs spearheaded an effort to remove Crosby from office; this culminated in the litigation of an ouster petition. Ultimately, the Tennessee Court of Appeals found that, despite Crosby's "bigotry, sexism or utter foolishness," any misconduct by Crosby was insufficient to support his ouster. *State ex rel. Carney v. Crosby*, 255 S.W.3d 593, 595, 602 (Tenn. Ct. App. 2008).

[7] Ruth was reelected, and Muhlstadt's and Anderson's seats were apparently not up for election.

that Crosby did not sabotage the Town's finances and property. On November 18, Anderson and Long visited Childs at City Hall, informed him of the actions at the October 28 meeting, and requested that he swear Long in as an alderman. Childs replied that he did not have time to verify that Long had been properly appointed to the Board, and he told Long to see Robertson County Circuit Judge Burton Glover to receive the oath of office. Later that day, Long went instead to Coopertown City Judge Earl Porter, who swore him in.

Childs soon discovered that Long had not been sworn in by Glover. Childs called Porter and found that, before administering the oath, Porter had not requested any proof that Long was validly appointed as alderman. Childs then conducted "[his] own investigation" into the October 28 appointment by reviewing the meeting's agenda, an audio recording of the meeting, and the official records of the meeting. Childs concluded that Long's appointment had violated Tennessee's Open Meetings Act, Tenn. Code Ann. § 8-44-101 *et seq.*, because the public had received no notice regarding Muhlstadt's planned resignation. (Docket No. 78, Ex. 15 ¶ 16.)

Because Childs is not a lawyer, however, he "wanted to obtain a legal opinion from an attorney well versed in municipal law as to whether [Long's] election was valid." (*Id.* ¶ 17.) In his affidavit, Childs states that he did not contact MTAS advisor Jaeckel because Jaeckel is not a lawyer and because he knew that Jaeckel had already approved the appointment procedure.[8] Childs also refused to discuss the matter with City Attorney Holt, because Childs, as well as Ruth and Lee, "felt that Holt had become too close to Crosby and Long" and that "Holt abdicated his responsibilities to the Town as a neutral legal advisor." (*Id.* ¶ 18.) This feeling

---

[8] Childs did, however, consult with Jaeckel on unrelated matters.

4

was based on the fact that Holt (1) "wrote an ordinance that allowed Crosby to become a charity so that the Town could pay to have Crosby's personal equipment repaired" and (2) "failed to advise Crosby that he was violating . . . employees' First Amendment rights when Crosby fired them because they testified against him during the ouster proceeding." (*Id.*)

Accordingly, Childs set out to hire a new city attorney. He eventually selected Robert Wheeler, who had been recommended by an assistant district attorney as an expert in municipal law. Childs told Wheeler that he would nominate him at an upcoming Board meeting on December 1, 2008, and Wheeler said that he would accept the position if elected by the Board. Childs claims that, at this time, he did not discuss the Long matter with Wheeler.

Before the December 1 meeting, Long learned that Childs would refuse to recognize him as an alderman during the meeting. At his deposition, Long testified that he learned this during a phone call from Crosby, who had heard it from a Coopertown citizen, Shannon Crutcher, who in turn had heard it from Judge Porter. In Childs' affidavit, however, Childs claims that he personally called Long before the meeting. In any event, Childs states that he "saw no other choice but to not recognize Long as an Alderman until [he] could confirm that the election complied with the law." (*Id.* ¶ 21.) Because Childs was expecting a contentious and possibly disorderly meeting, he asked Coopertown Police Chief William Zimmerlee to have officers present at the meeting.

Long showed up to the December 1 meeting expecting that he would not be allowed in the building. Upon gaining entrance, he chose to sit at the aldermen's table. Before long, Childs asked Long to leave the table and sit in the audience, because Childs did not believe that Long

had been properly appointed as an alderman. Long refused, and, after some argument, Childs asked police officer Leslie Foreright to remove Long from the table.

In his affidavit, Foreright states that he believed that Long's refusal to leave the table was disruptive and disorderly. Foreright stood behind Long and asked him politely to leave; Long refused. At his deposition, Long testified that he knew that this refusal would have consequences, but that he "believed in the cause that [he] was representing." (Docket No. 93, Ex. 2 at 92.) At that point, Foreright placed his left hand on Long's right arm, holding it above the elbow, and pulled the arm back slightly.[9] In his affidavit, Foreright states that he hoped that this "minimal touch would be enough to get [Long] to voluntarily leave the table." (Docket No. 78, Ex. 8 ¶ 7.) Foreright held Long's arm in this manner for a period of time, which Long estimated as five or six minutes.[10]

Long testified that the initial contact by Foreright did not cause any pain. (Docket No. 92, Ex. 3 at 95.) Long did not cry out in pain, and he never indicated to Foreright that Foreright's actions were harming him. Indeed, Long testified that he is "a big boy," and that it "takes a lot, you know, of pain to hurt [him]." (*Id.* at 97.) Although Foreright never twisted

---

[9] At his deposition, Long "guess[ed]" that Foreright placed his right hand on Long's arm. (Docket No. 93, Ex. 2 at 88.) The video of the meeting, however, shows that Foreright used his left hand.

[10] Long testified that a second officer, Adam Bennett, also approached Long during the incident and "tapped" his shoulder to let him know that he was there. (*Id.* at 88.) He further testified that Bennett rested his right hand on Long's shoulder for several minutes. Long conceded that this contact did not cause him any pain. Bennett denies touching Long. Although the video of the meeting is inconclusive as to whether Bennett ever touched Long – the camera's view is blocked for several seconds – it does show that Bennett did not touch him for any extended period of time.

Long's arm behind his back, Long testified that Foreright's actions "stretch[ed]" his shoulder, causing him pain. (*Id.*) Long quantified this pain as being a "6 or 7" on a scale of 10. (*Id.* at 98.)

A videotape of the December 1 meeting documented most of Foreright's contact with Long. (*See* Docket No. 82.) In the video, Long does not appear to be in any pain during the incident; instead, he continues, unfazed, arguing with Childs. Although Foreright does appear to grasp Long's right arm, he does not pull the arm backward to any great degree. Almost immediately, Long turns his torso slightly to the right, which undoubtedly minimized any stretching of his shoulder. Long never appears to be in a physically uncomfortable position. The video cuts out before Foreright releases Long; in all, it shows just under five minutes of the contact between the two men.[11]

During the several minutes that Foreright was touching Long, there was a heated argument among the mayor, the aldermen, and the audience. Eventually, Childs relented and allowed Long to remain at the aldermen's table, at which point Foreright released Long's arm. Afterward, Long did not feel any pain in his shoulder, and he did not suffer any bruising or other damage to his arm. Long did not seek medical attention following the meeting.

At the December 1 meeting, the Board confirmed Wheeler as the new city attorney. The

_____

[11] The video clearly shows Foreright initially grasping Long's arm, but, for the remainder of the relevant portion of the video, the camera angle makes it difficult to actually determine whether Foreright is still touching Long. In his affidavit, Foreright states that he held Long's arm for "a couple of minutes" and released it when Childs agreed to allow Long to remain at the table. (Docket No. 78, Ex. 8 ¶ 8.) Thus, the court assumes that Foreright was holding Long's arm for the duration of the argument between Long and Childs.

next day, Childs asked Wheeler to investigate the issue of whether Long was properly appointed to the Board.  On December 5, 2008, Wheeler provided a legal memorandum concluding that Long's October 28 appointment violated the Open Meetings Act, because there was not sufficient public notice regarding Muhlstadt's resignation and the selection of his replacement. (Docket No. 78, Ex. 3.)  Childs announced this conclusion at a special Board meeting on December 5, and he notified the audience that another special meeting would be held on December 19, 2008 to select an alderman to fill Muhlstadt's vacant seat.

On December 16, 2008, Long obtained a temporary injunction from the Chancery Court for Robertson County preventing the upcoming selection.  After a bench trial on January 5, 2009, the state court found that Long's appointment complied with the Open Meetings Act, and it permanently enjoined the Town from failing to recognize Long as an alderman.  From that point forward, the defendants allowed Long to fully participate in all Board meetings.  The Town appealed the trial court's decision, but, as explained below, by the time the Tennessee Court of Appeals decided the matter, Long had resigned his seat.  The court filed a *per curiam* decision denying the appeal as moot (Docket No. 78, Ex. 24), and the Tennessee Supreme Court denied permission to further appeal, *Long v. City of Coopertown*, No. M2009-00385-SC-R11-CV, 2010 Tenn. LEXIS 390 (Tenn. Apr. 14, 2010).

Long claims that, soon after the trial court's decision, the defendants began harassing him.  First, he notes that Officer Bennett drafted a "Matter of Record" regarding a January 13, 2009 traffic stop of Long's mother-in-law.  That document stated, in relevant part:

> Jack Long Jr. continuously attempts to manipulate the laws to
> benefit himself just as he did when he unlawfully parked his motor

8

> vehicle along Hwy 49 across from the middle school after I pulled
> his mother-in-law over for blatantly running the stop sign at
> Burgess Gower at Hwy 49. Jack Long Jr. then exited his vehicle
> that was unlawfully parked and approached this officer interfering
> with a lawful traffic investigation. Long immediately identified
> himself as an alderman intimidating me to release his mother-in-
> law with a warning.

(Docket No. 78, Ex. 10.)

The defendants have submitted a dashboard camera video from a patrol car that arrived

after Bennett had pulled over Long's mother-in-law. As the patrol car arrives, Long is seen

walking from his parked car toward the scene. There is no audio, but Long appears to engage in

friendly conversation with the officers.[12] After approximately two minutes, Long returns to his

car.

In his affidavit, Police Chief Zimmerlee states that he believed that Long's conduct

during the traffic stop was "inappropriate" and that he spoke with an assistant district attorney

regarding whether it was illegal. (Docket No. 78, Ex. 12 ¶ 16.) After reviewing the video of the

stop, the assistant district attorney "concluded that it was close, but that Long had done nothing

illegal," so Zimmerlee took no further action regarding the incident. (*Id.*)

Later in January 2009, a series of unfortunate events befell Long. On January 14, Long's

truck was set on fire during a Board meeting. On January 27, "for sale" signs were placed in his

yard. At some point, cards and photos were stolen from Long's house and mailed back to him

---

[12] The plaintiff has apparently reviewed a copy of the video with audio, because his brief
describes the conversation in the video in some detail. (Docket No. 93 at 17-18.) The plaintiff
characterizes the conversation as friendly and joking, but he does admit that he mentioned that
he was an alderman.

anonymously. Several months later, Long awoke one morning to find nails scattered in his driveway. Long admits, however, that he has no proof that any of the defendants was involved in these actions. (*See* Docket No. 94.)

Finally, Long blames the defendants for a complaint that was filed with Long's employer in July 2009 by Coopertown resident Susan Slawson. Long was upset that Childs had appointed Slawson to serve on a police committee, because Long believed that she had a "checkered past working for the corrections department." (Docket No. 93, Ex. 2.) Long sent a letter to Childs enclosing Slawson's personnel file and requesting that she be removed from the committee. Childs shared these documents with Slawson.

Several days later, Long contacted Police Chief Zimmerlee to discuss his concerns regarding Slawson. When Zimmerlee returned Long's call, Zimmerlee had Slawson on the line, apparently unbeknownst to Long. Zimmerlee later drafted a memorandum to Childs regarding the conversation:

> I was requested to return Alderman Long's phone call in reference to Susan Slawson. During the phone conversation with Alderman Long I had Susan Slawson on the other line so she may listen to the phone conversation. . . .
>
> Alderman Long went on to ask me if I knew why Susan Slawson was fired from the Tennessee Department of Corrections and I stated no. . . . Alderman Long stated that he went to the State Personnel Office and got a copy of Susan Slawson's personnel file and was going over to the last place that Susan Slawson had worked to gain more information. . . .
>
> Alderman Long went on to say that he knows that Susan Slawson set his truck on fire, broke into his home and threw nails in his driveway. . . . Susan Slawson has been questioned by Investigator Danny Vaden and to my best knowledge has not been implicated

> in any of these crimes. . . . I feel that Alderman Long [is] using his
> position as an Alderman and a State Employee to gain information
> against Susan Slawson for a vindictive nature.

(Docket No. 78, Ex. 14 (minor grammatical corrections included).)

Not surprisingly, Slawson was displeased with Long's efforts to remove her from the police committee. Long is employed as a supervisor at the Tennessee Department of Labor, and Slawson contacted the department to file a complaint against Long. Slawson alleged that: (1) Long had sent a 500-page fax from the state's fax machine to the Town; and (2) Long had investigated her on state time during the work day. At her deposition, Slawson testified that neither Childs nor Zimmerlee asked her to file this complaint. (Docket No. 78, Ex. 4 at 87-88.)

Long denied any wrongdoing and maintained that he had investigated Slawson during his lunch hours, not during his work hours. Nevertheless, the Department of Labor conducted an investigation, which found that Long had used state resources to work on Town business. Specifically, a report by the Department of Labor's Internal Audit Section concluded that Long had spent approximately 7.5 percent of his work days on non-work-related internet usage and that Long had billed Coopertown for at least two hours of town work that he had performed during the work day. (Docket No. 78, Ex. 5 at 3-5.) Long received a written warning and a one-day suspension without pay.

Ultimately, Long resigned his Board seat on September 1, 2009. On September 28, 2009, he filed this suit against the Town, Childs, Zimmerlee, Foreright, and Bennett. Long's Verified Complaint asserts claims for: (1) violation of 42 U.S.C. § 1983; (2) violation of 42 U.S.C. § 1985; (3) violation of 42 U.S.C. § 1986; (4) assault and battery; (5) intentional infliction of

emotional distress; and (6) negligent infliction of emotional distress.  Each defendant has filed a

Motion for Summary Judgment, pursuant to Federal Rule of Civil Procedure 56, arguing that all

of the plaintiff's claims should be dismissed.

## ANALYSIS

### I.      Summary Judgment Standard

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows

that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  If a moving defendant shows that there is no genuine issue

of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the

plaintiff to provide evidence beyond the pleadings "set[ting] forth specific facts showing that

there is a genuine issue for trial."  *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir.

2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "In evaluating the

evidence, the court must draw all inferences in the light most favorable to the [plaintiff]."

*Moldowan*, 578 F.3d at 374.

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the

truth of the matter, but to determine whether there is a genuine issue for trial.'"  *Id.* (quoting

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  But "the mere existence of a

scintilla of evidence in support of the plaintiff's position will be insufficient," and the plaintiff's

proof must be more than "merely colorable."  *Anderson*, 477 U.S. at 249, 252.  An issue of fact

is "genuine" only if a reasonable jury could find for the plaintiff.  *Moldowan*, 578 F.3d at 374

(citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## II.     Section 1983 Claims

The plaintiff alleges that the defendants violated 42 U.S.C. § 1983 by depriving him of his First, Fourth, and Fourteenth Amendment rights.[13]  The defendants argue that they did not violate the plaintiffs' rights and, alternatively, that they are entitled to qualified immunity.

Section 1983 creates liability for defendants who, "under color of [law], . . . subject[] . . . any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."  42 U.S.C. § 1983.  Thus, a § 1983 plaintiff must show: "(1) the violation of a right secured by the federal Constitution or federal law (2) that was committed by a person acting under color of state law."  *Brown v. Matauszak*, No. 09-2259, 2011 U.S. App. LEXIS 2011, at *10-11 (6th Cir. Jan. 31, 2011).

A plaintiff must also show that individual defendants are not entitled to qualified immunity.  *Dorsey v. Barber*, 517 F.3d 389, 394-95 (6th Cir. 2008).  "The doctrine of qualified immunity protects government officials who perform discretionary functions from civil liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Tucker v. City of Richmond*, 388 F.3d 216, 220 (6th Cir. 2004) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 817-18 (1982)).  "The doctrine protects all but the plainly incompetent or those who knowingly violate the law."  *Dorsey*, 517 F.3d at 394 (quotation marks omitted).

---

[13] The Verified Complaint alleges that the defendants violated the plaintiff's First, *Eighth*, and Fourteenth Amendment rights.  (Docket No. 1 ¶ 26.)  Of course, the Eighth Amendment, which prohibits cruel and unusual punishment, is inapplicable here.  The court assumes that the plaintiff instead intended to list the Fourth Amendment.

A three-part test determines whether qualified immunity is warranted:

> The first inquiry is whether the Plaintiff has shown a violation of a constitutionally protected right; the second inquiry is whether that right was clearly established at the time such that a reasonable official would have understood that his behavior violated that right; and the third inquiry is whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established rights.

*Tucker,* 388 F.3d at 220 (quoting *Higgason v. Stephens*, 288 F.3d 868, 876 (6th Cir. 2002)) (quotation marks omitted).

Analyzing whether the plaintiff had a clearly established constitutional right "'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Id.* at 220 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). "'If the [official's] mistake as to what the law requires is reasonable, . . . the [official] is entitled to the immunity defense.'" *Id.* (quoting *Saucier*, 533 U.S. at 205) (ellipsis in original). The defendants, however, "'bear the burden of showing that the challenged act was objectively reasonable in light of the law existing at that time.'" *Id.* (quoting *Harlow*, 457 U.S. at 815).

The plaintiff's § 1983 claims are based on several distinct actions: (1) Childs' refusal to recognize the plaintiff as an alderman at the December 1, 2008 meeting and thereafter; (2) the allegedly excessive force used by the police officers at the December 1 meeting; (3) the property crimes committed by anonymous perpetrators; (4) the police department's actions regarding the traffic stop of the plaintiff's mother-in-law; and (5) Slawson's complaint to the plaintiff's employer. The court will address each of these topics in turn.

### A.     Refusal to Recognize Status as Alderman

The plaintiff argues that Childs's refusal to recognize him as an alderman constituted a violation of his First Amendment rights. (Docket No. 93 at 24-26.) In response, the defendants argue that Childs' actions were lawful because legitimate questions existed regarding the validity of Long's appointment.

The plaintiff asserts, and none of the defendants disputes, that a duly elected official enjoys a First Amendment right to hold office. In support, the plaintiff primarily cites *Flinn v. Gordon*, 775 F.2d 1551 (11th Cir. 1985), which noted the existence of a "constitutional right to run for office and to hold office once elected." *Id.* at 1554 (also noting the lack of a "constitutional right to win an election"), *cited in Lewis v. Craft*, No. 94-5322, 1995 U.S. App. LEXIS 36199, at *12 (6th Cir. Sept. 19, 1995); *see also Randall v. Scott*, 610 F.3d 701, 711 (11th Cir. 2010) ("While there is no 'fundamental status to candidacy' . . . , there is at least some constitutional right to candidacy."). It seems obvious, however, that if a candidate has *not* been lawfully elected or appointed, he has no constitutional right to hold office. Certainly, a state has an interest in ensuring that a candidate has been properly elected before allowing that candidate to wield the power of the office.

The crux of the instant case is whether the Board's selection of Long as Muhlstadt's replacement at the October 28 meeting complied with Tennessee's Open Meetings Act (the "Act").[14] The Act provides that "[a]ll meetings of any governing body are declared to be public

---

[14] Surprisingly, the plaintiff's response brief completely fails to address this issue (*see* Docket No. 93 at 24-26), which Childs' brief explicitly raises (Docket No. 78, Ex. 1 at 25, 28-29; *see also* Docket No. 101 at 10). Instead, the plaintiff simply assumes that the Boards' actions were valid.

meetings open to the public at all times."[15]  Tenn. Code Ann. § 8-44-102(a).  Accordingly, the

Act requires that "[a]ny such governmental body which holds a meeting previously scheduled by

statute, ordinance, or resolution shall give *adequate public notice* of such meeting."  *Id.* §

8-44-103(a) (emphasis added).  It further provides that "[a]ny action taken at a meeting in

violation of [the Act] shall be void and of no effect."  *Id.* § 8-44-105.  Notably, "the Act does not

make a distinction between technical and substantive violations of its provisions."  *Zseltvay v.

Metropolitan Gov't of Nashville & Davidson County, Tenn.*, 986 S.W.2d 581, 584 (Tenn. Ct.

App. 1998).

Here, the agenda published in advance of the October 28 meeting did not mention

Muhlstadt's resignation or the selection of his replacement, and an issue exists as to whether this

constituted adequate public notice.  Tennessee courts have stated that it is "'impossible to

formulate a general rule in regard to what the phrase 'adequate public notice' means.'"  *Souder

v. Health Partners, Inc.*, 997 S.W.2d 140, 149 (Tenn. Ct. App. 1998) (quoting *Memphis Publ'g

Co. v. City of Memphis*, 513 S.W.2d 511, 513 (Tenn. 1974)).  Instead, "adequate public notice"

simply means "'adequate public notice under the circumstances, or such notice based on the

totality of the circumstances as would fairly inform the public.'"  *Id.* (quoting *Memphis Publ'g*,

513 S.W.2d at 513.  "Thus, the circumstances of each case must be taken into account in order to

determine the adequacy of the notice given."  *Id.*

Under certain circumstances, the failure to mention an important item of business in the

_____

[15] There is no dispute that the Board is a "governing body" and that the October 28
meeting was a "meeting," as those terms are defined by the act.  *See* Tenn. Code Ann. §
8-44-102(b)(1), (2).

public notice of a meeting can render that notice inadequate. For example, in *Neese v. Paris Special School Dist.*, 813 S.W.2d 432 (Tenn. Ct. App. 1990), a Tennessee school board had a two-day meeting in Aurora, Kentucky to discuss "clustering," a controversial plan to reorganize the grade levels at the district's schools. *Id.* at 433. The public received notice that the board would be meeting on those dates via a newspaper article, which mentioned two planned topics of discussion. *Id.* at 435. The article did not, however, mention that clustering would be discussed. *Id.* The court held that, because the issue of clustering was of "pervasive importance," this notice was inadequate:

> [U]nder these circumstances, the public had a right to be informed that the issue of clustering would be extensively discussed . . . . If the major issues discussed were actually those stated in the newspaper . . . , perhaps there would be no interest in traveling to Kentucky for a two-day meeting. On the other hand, if the general public was aware that the major issue was not [the topics] reported in the newspaper, but rather was the issue of clustering, there would likely be more interest in attending. Certainly "adequate public notice under the circumstances" is not met by misleading notice. We do not suggest that any party intentionally misled the public with regard to notice, but we do believe that the notice was insufficient under the circumstances presented in the record before this Court.

*Id.* at 435-36.

In contrast, in *Souder*, the board of trustees of a county hospital district ratified various decisions of a government-created preferred provider organization ("PPO") during a meeting. 997 S.W.2d at 142-43. This included the PPO's decision to limit its physician provider network and to terminate its contract with the plaintiff doctor. *Id.* The board of trustees gave public notice of the meeting, but the notice did not specifically mention that the board would consider

ratifying the PPO's actions. *Id.* at 150. The court held that, because "the meeting was not limited to this sole subject" and because the meeting's agenda "presented several different areas regarding the business of the District," the failure to include that particular issue did not render the notice inadequate.[16] *Id.*

The facts of the instant case are more akin to those in *Neese* than to those in *Souder*, because the selection of Muhlstadt's replacement was, relatively speaking, a very important issue. The selection of one member of a four-member Board of Aldermen is a critical decision that has the potential to affect every subsequent decision by the Board. Such a selection is inherently more important than the standard day-to-day business of the Board. Here, the selection was especially critical, given the fractured nature of Coopertown politics and the existence of the Town's competing political factions. In fact, one week after the October 28 meeting, Childs soundly beat Crosby in the mayoral election, which suggests that some citizens might have opposed the appointment of Long, who previously served as vice mayor under Crosby.

As in *Neese*, if the public notice had disclosed that the Board would be selecting Muhlstadt's replacement, it is likely that more citizens would have attended the meeting. For example, the defendants have submitted evidence that both Childs and Ruth would have attended. (Docket No. 78, Ex. 15 ¶ 17; *id.*, Ex. 19 at 1-2.) They have also submitted the

---

[16] The court ultimately voided the board's actions, however, because the board ratified the PPO's actions without substantially discussing the issue. *Id.* at 150-51. To comply with the Open Meetings Act, a meeting that ratifies a previous decision must include "'new and substantial reconsideration of the issues, in which the public is afforded ample opportunity to know the facts and to be heard with reference to the matters at issue.'" *Id.* at 149 (quoting *Neese*, 813 S.W.2d at 436).

affidavit of Kyle Wilson, a Coopertown citizen who states that, had he known of Muhlstadt's resignation in advance, he would have attended and asked to be considered as Muhlstadt's replacement. (Docket No. 78, Ex. 20.) This undisputed evidence shows that the lack of notice resulted in fewer candidates for the position and in less opposition to the Board's selection of Long.

Crosby and Muhlstadt, and possibly others, knew weeks ahead of time that Muhlstadt planned to resign. Under these circumstances, the court finds that, because the public notice of the October 23 meeting failed to mention Muhlstadt's resignation and the planned selection of his replacement, that notice was inadequate. Therefore, the Board's selection of Long as Muhlstadt's replacement violated the Open Meetings Act, and that action was void.[17] *See* Tenn. Code Ann. § 8-44-105. The plaintiff thus had no lawful claim to the office of alderman and no constitutional right to hold that office.

Of course, this contradicts the conclusion reached by the state trial court, which issued an injunction ordering the Town to recognize Long as an alderman. But this court is not bound by the reasoning of that court, and it appears that the state court at least partly misapplied the relevant law.[18] In finding that the public notice was adequate, the state court relied on two

---

[17] The Board also violated the Open Meetings Act when it failed to mention the vote and to record the vote's results in the official records of the meeting. Tenn. Code Ann. § 8-44-104(a) (providing that meeting minutes "shall be promptly and fully recorded . . . and shall include . . . a record of . . . all motions, proposals and resolutions offered, the results of any votes taken, and a record of individual votes in the event of roll call"). But it appears that this violation, standing alone, would not void the Board's selection of Long. *Zseltvay*, 986 S.W.2d at 585.

[18] In addition, collateral estoppel does not apply to prevent the defendants from arguing that Long's appointment violated the Open Meetings Act. "[A] prior state court action will not preclude litigation in federal court when the litigant against whom the preclusive effect is sought

findings: (1) that the October 28 meeting "was not limited to the sole issue of the election of the Ward 2 Alderman"; and (2) that "there is no evidence in the record that there was an attempt to mislead the public."[19]  But *Neese* held that the omission of one major topic can render a notice inadequate, so it is not dispositive that the meeting also involved other topics.  813 S.W.2d at 435-36.  It is unclear whether the state court addressed the relative importance of the selection of Muhlstadt's replacement.  Moreover, *Neese* explained that notice can be misleading even though no one intended to mislead the public, making the state court's second finding irrelevant.  *Id.* at 436; *see also State ex rel. Akin v. Kingston Springs*, No. 01-A-01-9209-CH-00360,1993 Tenn. App. LEXIS 586, at *11 (Tenn. Ct. App. Sept. 8, 1993) (finding that the defendant public officials violated the Act regardless of their "motives and intentions").

Regardless, it is not necessary for this court to find that Long's appointment *undisputedly* violated the Act; it is enough that Childs had a reasonable and good-faith belief that it did.[20]

---

did not have a full and fair opportunity to litigate the claims or issues decided by the state courts."  *Daubenmire v. City of Columbus*, 507 F.3d 383, 389 (6th Cir. 2007).  "The inability of a party to appeal from an adverse determination in the prior proceeding is a major factor to be considered" when determining whether a party received a full and fair opportunity to litigate. *United States v. Salemo*, 81 F.3d 1453, 1464 (9th Cir. 1996) (citing *Standefer v. United States*, 447 U.S. 10, 22-24 (1980)).  Here, because the Tennessee Court of Appeals declined to review the substantive merits of the Town's appeal after Long's resignation, the Town was prevented from fully litigating those issues, making the doctrine of collateral estoppel inapplicable.

[19] The parties have not submitted the written decision of the trial court, but the defendants have submitted the Town's appellate brief (Docket No. 78, Ex. 6), which quoted extensively from the trial court's memorandum.  This court is relying on the content of that brief for the substance of the trial court's decision.

[20] The Open Meeting Act's "totality of the circumstances" test for analyzing notice is flexible enough that courts and lawyers can reasonably disagree on its application to a particular set of facts.

Indeed, Childs received a legal opinion from the Town's city attorney advising him that Long's appointment was unlawful. The plaintiff provides no support for the proposition that a candidate has a constitutional right to hold office when the validity of his election or appointment is in dispute and the government has, after a reasonable investigation, determined that the election or appointment was invalid. Certainly, a state must be able to refuse to seat a candidate when it appears that the candidate is not a legitimate officeholder. Of course, an aggrieved candidate may, as Long did, seek a declaration of rights from the judicial branch. The plaintiff has not shown that, under the circumstances of this case, the defendants violated Long's constitutional rights by refusing to recognize him as an alderman.

Furthermore, even if Childs' refusal to recognize Long did violate Long's rights, Childs is shielded from liability by qualified immunity. First, for all of the reasons discussed above, Long's right to hold the office of alderman was not "clearly established." Second, Childs' actions were objectively reasonable. After recognizing the potential issues regarding the Open Meetings Act, Childs refused to recognize Long at a single Board meeting before soliciting a legal opinion from the city attorney.[21] After the legal opinion confirmed that Long's selection was invalid, Childs promptly scheduled a Board meeting to select Muhlstadt's replacement, at which point Long could have sought election. Once Long secured an injunction, Childs recognized him as an alderman.

In sum, Childs' refusal to recognize Long as an alderman cannot form the basis of a §

---

[21] The fact that Childs chose not to solicit the opinions of Jaeckel, who is a non-lawyer, or Holt, who was a member of Crosby's administration, does not render Childs' actions unreasonable. Moreover, the evidence suggests that Wheeler, Childs' selection for city attorney, was qualified, and nothing indicates that Wheeler's legal opinion was tainted by bias.

1983 action because it did not violate Long's constitutional rights, and, in any event, Childs is entitled to qualified immunity.

**B.      Excessive Force at the December 1, 2008 Meeting**

The plaintiff further argues that the police officers' actions at the December 1 meeting constituted excessive force, in violation of the plaintiff's Fourth and Fourteenth Amendment rights.  (Docket No. 93 at 26-36.)

"'[C]laims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . .'" *Slusher v. Carson*, 540 F.3d 449, 454 (6th Cir. 2008) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).  Thus, whether a constitutional violation occurred depends on whether the police officer's actions were reasonable:

> In making this determination, we use an "objective reasonableness" standard that does not include the underlying intent or motivation of the officer.  Relevant factors to consider in evaluating what level of force is reasonable include the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight. These factors are not an exhaustive list, and the ultimate inquiry is whether the seizure was reasonable under the "totality of the circumstances."

*Id.* at 455 (quotation marks and citation omitted).

Here, the defendant officers' actions at the December 1 meeting did not constitute excessive force.  As explained above, Childs properly refused to recognize Long as an alderman at the meeting.  Moreover, Tennessee law provides that it is a misdemeanor for a person who

"inten[ds] to prevent or disrupt a lawful meeting" to "substantially obstruct[] or interfere[] with the meeting . . . by physical action or verbal utterance."[22] Tenn. Code Ann. § 39-17-306(a). For obvious reasons, Long's unauthorized presence at the aldermen's table was disruptive. Thus, the defendants were justified in seeking to remove Long from the aldermen's table and to place him in the general audience.

The court finds that, under these circumstances, the amount of force used by the officers was objectively reasonable. It is undisputed that the officers did not physically remove Long from the table; instead, they used minimal physical contact in an effort to convince Long to leave voluntarily. Under the plaintiff's own account, Bennett merely placed his hand on the plaintiff's shoulder, which did not cause any pain. Foreright gently gripped the plaintiff's arm above the elbow, pulled it back slightly, and held it for several minutes while the plaintiff argued with the mayor. An officer in Foreright's position would not reasonably expect this action to cause any pain.[23] Because the physical contact between the plaintiff and the officers was so minimal, and because Childs and the officers were justified in attempting to remove Long from the aldermen's

_____

[22] The plaintiff argues that he could not possibly have disrupted the meeting because the meeting had not officially started yet when he refused to leave the table. (Docket No. 93 at 34.) This argument is unpersuasive. Long made it clear that he intended to remain at the table for the duration of the meeting.

[23] Although the plaintiff testified that Foreright's actions did indeed cause serious pain in his shoulder, no reasonable juror could credit this testimony. First, the plaintiff admitted that he never cried out in pain and that he felt no pain after Foreright released his arm. Second, the video of the meeting shows that, during the incident, the plaintiff continued talking and arguing with the mayor and essentially ignored Foreright's grip. At no point during the incident does the plaintiff appear to be in any pain. Moreover, the video reveals that the plaintiff twisted his upper torso slightly toward Foreright, reducing the amount that his shoulder was stretched.

Regardless, for the purposes of the excessive force claim, what matters is not whether the plaintiff actually felt pain, but whether the officers' actions were reasonable.

table, the defendants' actions were reasonable.

The plaintiff cites a number of cases finding that police officers used excessive force, but these cases actually undermine the plaintiff's claim. In each case, the defendant officers used substantial physical force when arresting the plaintiff. *Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 171 (6th Cir. 2004) (while arresting the plaintiff, the officers attempted to sweep her leg, threw her up against a wall, and broke her elbow); *Vance v. Wade*, 546 F.3d 774, 778 (6th Cir. 2008) (after the arrest, the officer "crammed [the plaintiff's] head down on [his] shoulder" and shoved him face first into the floorboard of the patrol car's back seat); *Burden v. Carroll*, 108 Fed. Appx. 291, 292 (6th Cir. 2004) (the officer slammed the plaintiff into a brick wall); *Shreve v. Jessamine County Fiscal Court*, 453 F.3d 681, 684 (6th Cir. 2006) (the officers sprayed the plaintiff with pepper spray, threw her to the ground, and hit her); *St. John v. Hickey*, 411 F.3d 762, 766 (6th Cir. 2005) (the officers forced the plaintiff, who could not bend his legs because of muscular dystrophy, into the back of a police car, injuring his leg; they also caused him to fall out of his wheelchair while taking him down a step). Here, in contrast, Foreright merely held the plaintiff's arm for several minutes.

Because this slight physical contact was reasonable, it did not violate the plaintiff's constitutional rights. Moreover, the fact that Childs and the officers acted reasonably entitles them to qualified immunity.

### C.    Criminal Harassment

The plaintiff's Verified Complaint alleges that the various crimes committed against the plaintiff – the arson of his truck, the burglary of his house, the placement of yard signs and nails

on his property – constituted violations of his civil rights. But the plaintiff admits that he has no proof linking the defendants to any of these crimes. (Docket No. 94.) Accordingly, these crimes cannot form the basis of the plaintiff's § 1983 claims.

### D.     Traffic Stop

The plaintiff spends several pages of his brief discussing the "Matter of Record" written by Officer Bennett regarding the plaintiff's actions during the traffic stop of his mother-in-law. (Docket No. 93 at 15-18.) The plaintiff disputes Bennett's statement that the plaintiff "identified himself as an alderman[,] intimidating [Bennett] to release his mother-in-law with a warning." (*Id.* at 16.)

The plaintiff does not explain, however, how this incident violated his constitutional rights. The "Matter of Record" was an internal police department document, and the plaintiff was never prosecuted for his actions during the traffic stop. Thus, this incident cannot form the basis of the plaintiff's § 1983 claims.

### E.     Slawson's Complaint

Finally, the plaintiff argues that Susan Slawson's complaint to his employer constituted a violation of his constitutional rights. Again, the plaintiff spends pages discussing the facts of this incident (Docket No. 93 at 19-20) but glosses over any analysis of how, exactly, it violated his rights (*see id.* at 43).

The undisputed evidence shows that the plaintiff decided to attack Slawson's qualifications to serve on a police committee by sending a letter to Childs containing Slawson's decades-old personnel file. Childs shared this letter with Slawson. The plaintiff then contacted

Zimmerlee to discuss Slawson's qualifications; when Zimmerlee returned the plaintiff's call, he had Slawson on the line. Subsequently, Slawson filed a complaint with the plaintiff's employer, alleging that he improperly used state resources while investigating her background.

The plaintiff does not explain how Childs' and Zimmerlee's actions violated his constitutional rights. The plaintiff admits that he has no proof that Childs ordered Slawson to file the complaint. (Docket No. 94 ¶ 56.) Nor does he have proof that Zimmerlee ordered Slawson to file the complaint; instead, he argues that Zimmerlee "should have known what Slawson would do." (*Id.* ¶ 53.) But the defendants were plainly within their rights to share information with Slawson regarding the plaintiff's grievances. Again, this incident cannot form the basis of the plaintiff's § 1983 claims.

In sum, the plaintiff cannot show that any of the defendants' conduct violated his constitutional or federally protected rights. Moreover, as discussed above, the individual defendants have in many instances shown that they are entitled to qualified immunity. Accordingly, the plaintiff's § 1983 claims against the defendants will be dismissed.[24]

## III.    Section 1985 Claims

The plaintiff further alleges that the defendants violated §§ 1985 and 1986 by conspiring to deprive him of his civil rights. Section 1985 prohibits conspiracies "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws," *id.* § 1985(3), and § 1986

---

[24] Because the plaintiff has not shown that the individual defendants violated his constitutional rights, his § 1983 claim against the Town must be dismissed. "[T]here can be no municipal liability . . . for maintaining a[n unconstitutional] policy . . . when no . . . unconstitutional [conduct] has actually occurred." *Tucker*, 388 F.3d at 224.

creates liability for people who "neglect[] or refuse[]" to prevent such conspiracies, *id.* § 1986.

To recover under § 1985(3), a plaintiff must show:

> (1) the existence of a conspiracy; (2) the purpose of the conspiracy was to deprive any person or class of persons the equal protection or equal privileges and immunities of the law; (3) an act in furtherance of the conspiracy; and (4) injury or deprivation of a federally protected right.

*Royal Oak Entm't, LLC v. City of Royal Oak*, 205 Fed. Appx. 389, 399 (6th Cir. 2006) (citing

*Haverstick Enters., Inc. v. Financial Federal Credit, Inc.*, 32 F.3d 989, 993 (6th Cir. 1994)).

Section 1985(3) "applies only where the discrimination was based on race or membership in

another class comprising 'discrete and insular minorities that receive special protection under the

Equal Protection Clause because of inherent personal characteristics.'" *Id.* (quoting *Volunteer*

*Med. Clinic, Inc. v. Operation Rescue*, 948 F.2d 218, 224 (6th Cir. 1991)).

Setting aside the issue of whether the plaintiff belongs to a "discrete and insular

minorit[y]," as explained in the previous section, the plaintiff has not shown that any of the

defendants' actions violated his constitutional or federally protected rights. Accordingly, his §§

1985 and 1986 claims against the defendants will be dismissed. *See Molnar v. Care House*, 359

Fed. Appx. 623, 627 (6th Cir. 2009) ("[The plaintiff] cannot demonstrate the existence of a

conspiracy to violate his federal rights if he cannot first demonstrate an underlying deprivation of

a federal right.").

## IV.    State Law Claims

Finally, the plaintiff has asserted several state law tort claims. First, the plaintiff has

asserted claims for assault and battery against Bennett, Foreright, and Zimmerlee. But "[w]here

a plaintiff asserts a battery claim under Tennessee law that arises out of the same use of force as [his] § 1983 excessive-force claim, the analysis is the same for both causes of action." *Griffin v. Hardrick*, 604 F.3d 949, 956 (6th Cir. 2010). Because the plaintiff's § 1983 excessive force claims are meritless, the court will also dismiss his state law battery claims. *Id.*

Second, the plaintiff has asserted a claim for outrageous conduct or intentional infliction of emotional distress against all of the defendants.[25] To recover on this claim, a plaintiff must show: "(1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct complained of must result in serious mental injury." *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). Liability exists "'only where the [defendant's] conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community'"; in other words, "'the recitation of the facts to an average member of the community [must] arouse his resentment against the actor, and lead him to exclaim, 'Outrageous.''" *Id.* at 623 (quoting *Medlin v. Allied Inv. Co.*, 398 S.W.2d 270, 274 (Tenn. 1966)).

Here, no reasonable juror could conclude that the defendants' conduct rose to this level of outrageousness. None of the actions at issue violated the plaintiff's constitutional rights, and, in most instances, the court has explicitly found that the defendants' actions were reasonable. Accordingly, the plaintiff's claim for intentional infliction of emotional distress will be

---

[25] In Tennessee, the terms "outrageous conduct" and "intentional infliction of emotional distress" refer to the same tort and are used interchangeably. *Bain v. Wells*, 936 S.W.2d 618, 622 n.3 (Tenn. 1997).

dismissed.

Third, the plaintiff has asserted a claim for negligent infliction of emotional distress. Under Tennessee law, a plaintiff may only recover on such a claim by showing "'serious' or 'severe' emotional injury," which "must be supported by expert medical or scientific proof." *Camper v. Minor*, 915 S.W.2d 437, 446 (Tenn. 1996). The plaintiff has not identified any expert witnesses that he intends to call at trial, and the deadline for disclosure of expert witnesses has passed. Because the plaintiff will be unable to present any expert proof regarding his emotional injuries, his claim for negligent infliction of emotional distress must be dismissed.

## CONCLUSION

For the reasons discussed above, the defendants' Motions for Summary Judgment will be granted, and this action will be dismissed in its entirety. This renders the defendants' Motion to Strike, which seeks to strike certain material from the plaintiff's response brief, moot.

An appropriate Order will enter.

_____
ALETA A. TRAUGER
United States District Judge